UNITED STATES DISTRICT COURT
EASTERN DIVISION OF ARKANSAS
DELTA DIVISION

MICHAEL BLAINE FAULKNER                                          PETITIONER
Reg #03829-078

Case No. 2:23-CV-210-LPR-JTR

C. GARRETT, acting warden                                        RESPONDENT
FCI-Forrest City

**PETITIONER'S OBJECTION TO RECOMMENDED
DISPOSITION**

Petitioner Michael Blaine Faulkner ("Faulkner"), by and through counsel, the Koch Law Firm, P.A., for his objection to Document No. 11, the recommended disposition of the magistrate judge, states:

On May 10, 2024, the magistrate judge issued a recommended disposition in this case. Faulkner—for reasons described below—now files his timely objections to the recommended disposition and renews his motion for a discovery process and an evidentiary hearing in this matter.

A. <u>Faulkner Was Unable To File A Timely Reply Or Otherwise Move This Case Forward Because His Counsel Was Unable To Have Contact With Faulkner For Several Months, Thus Denying Faulkner Due Process.</u>

In the magistrate's recommendation, it is noted that Faulkner did not file a reply in this matter. However, Faulkner could not file a timely reply (or even a timely amended petition) because Faulkner had no contact with his attorney for more than four months.

In October 2023, Faulkner's counsel was initially contacted by a third party—known at the time to counsel only as "Sebastian Valence"—for the purpose of engaging counsel's assistance in this case. Counsel obtained a copy of Faulkner's *pro se* petition and agreed (through Valence) to assist Faulkner in a this matter. Counsel entered his appearance on November 6, 2023. Counsel

1

began trying to contact the Forrest City BOP unit[1] for the purpose of arranging contact with Faulkner via a jail visit or telephone call.  However, efforts to contact the BOP failed.  Numerous daily calls to the Forrest City unit went unanswered and emails were also initially unanswered.

Finally, on January 9, 2024, counsel received an email from the BOP that stated that counsel's request for contact with Faulkner had been "forwarded to the inmate's Unit Manager for review." *See* Exhibit A. After several days with no further contact with the BOP, counsel sent another email requesting contact with Faulkner.  On January 18, 2024, counsel received a second email from the BOP that read as follows: "Good Morning. I have forwarded your request to the Unit Manager. We ask for your patience due to the institution currently experiencing inclement weather." *See* Exhibit B. Once again, weeks went by with no further contact from the BOP.

On February 21, 2024, counsel contacted opposing counsel in this case to see if they could help with contacting the prison so counsel could meet with Faulkner.  The next day (presumably as a result of opposing counsel's efforts) counsel received an email from the BOP.  An attorney/client telephone visit was scheduled for March 29, 2024, but was later moved up to March 26.  On March 26, BOP contacted counsel via telephone and email and said that due to some security problem at the jail, the call would have to be rescheduled to March 28th.  *See* Exhibit C.

Finally, on March 28th—some four months after Faulkner's opportunity to file a reply had expired—counsel had his first interview with Faulkner about the case.

During this interim, counsel did have several conversations with the original third party that had arranged counsel's assistance in the first place, Sebastian Valence.  However, it was not until December 16, 2023, that counsel was made aware that Sebastian Valence is the same person

---

[1] As noted in the Magistrate's recommendation, the incident in question in this case occurred in Texarkana; however, Plaintiff was subsequently transferred to the Forrest City unit.

as Wesley Ryan Wilson, who was the inmate in this incident who took responsibility for ownership of the contraband. After being released from prison, Wilson changed his name to Valence. They are the same person. *See* Affidavit of Sebastian Valence, attached as Exhibit D.

On November 15, 2023, Respondent filed a response to this petition. However, because of counsel's inability to contact Faulkner (and counsel's ignorance of the fact that Valence and Wilson are actually the same person), between filing an entry of appearance on November 6, 2023, and December 16, 2023, the only reliable information that counsel had about the case was from the pleadings.[2] For these reasons, Petitioner was unable to coordinate with his attorney such as to file a reply or take any other action in this matter.

To deny discovery and a hearing in this matter would deny Faulkner due process in his petition.

> B. <u>Faulkner's Request For An Evidentiary Hearing Should Be Granted Because He Was Initially Unable To Provide Critical Information To His Attorney, And Because Discovery Is Necessary To Find And Present Critical Evidence.</u>

The Magistrate Judge recommended that Faulkner's request for the opportunity to seek discovery and the opportunity for a hearing in this matter be denied because (in summary) Faulkner did not explain in his motion what information would be sought in discovery and how such information could change the outcome of the case. As noted above, counsel was not able to visit with Faulkner and help him make those determinations until the end of March 2024.

---

[2] While Valence/Wilson and counsel did correspond during this timeframe, it was counsel's belief (at that time) that Valence/Wilson was simply a family member or concerned friend who was trying to help Faulkner hire an attorney. Even though counsel later found out that Valence was, indeed, Wilson, a key witness in the case that counsel needed to interview carefully, counsel did not learn the truth about this until December 16, 2023, when Valence/Wilson admitted this during a telephone conversation with counsel.

3

After Faulkner and his attorney were able to have contact, it was determined that (at least) the following information—if available and/or if put onto the record—would be relevant and dispositive in this case:

1. <u>The Contraband Was Not Found In a Small "Cell."</u>

The cases relied upon by the Respondent wherein prisoner sanctions have been upheld when contraband was found in common areas within their "cell" are distinguishable from this case.

The Magistrate Judge quotes the DHO's report as saying "the fact that the cell phones were found in a common area of the cell makes all inmates living there responsible." *See* Doc. No. 11 at the bottom of page 3. This infers that the area where the contraband was found was a "cell" within the normal use of that word, i.e., an enclosed area protected by concrete and/or steel with secure doors where inmates may be confined and where other inmates have no access to that area. Information from discovery, along with depositions and/or testimony at a hearing in this matter would reveal something very different: Faulkner, Wilson, Gray and nearly 120 other inmates all slept in one large room. There was only one large cell. There were sheetrock partitions between some groups of beds; but there were no doors and all 120 inmates had full access to the area where the contraband was found. The contraband was found in a light fixture that was approximately 10 feet off the floor above Wilson's bed. The contraband was only accessible by standing on top of Wilson's bed. It was not accessible from Faulkner's bed. *See* Exhibit D.

Unlike the secure "cells" in higher security prisons, this is simply a large room that is a common living area for approximately 120 inmates. It is entirely possible for one inmate to (for example) plant contraband in or around someone else's bed to get that person into trouble or for any other reason. Nothing prevents such activity, and to hold everyone in the room responsible for all contraband would be an injustice.

The area where the contraband was found was geographically closer to Faulkner and Wilson than it was to other inmates, but it was not in a "cell." It was inside a large common area where approximately 120 inmates all slept with no security from each other. There are sheetrock partitions added, presumably for the purpose of controlling noise and to provide some degree of privacy, but unlike other higher-security prisons, there are no cells.

### 2. Valence/Wilson Had Only Recently Moved Into the Contraband Area

Discovery and testimony would establish that the bed above where the contraband was found—the bed one had to stand on to access the contraband—had been occupied by an inmate named Michael McClelland until just prior to the contraband being found. *See* Exhibit D. The evidence would show that McClelland worked in the electrical shop and had access to tools and materials such that he was able to design the hiding area where the contraband was found, and that most of the contraband items found belonged to McClelland. *Id*. McClelland was caught using and selling contraband and was sanctioned and removed from the facility. (There are surely discoverable records of this.) But BOP officials did not find McClelland's stash of contraband. When McClelland was removed, Wilson was reassigned to that bed and discovered the contraband. Wilson generally took control of the hiding space and the contraband and hid his own cell phone there. *Id*. But aside from Wilson, neither Faulkner nor any other of the approximately 120 inmates had access to the contraband hiding space; it was only accessible from Wilson's bed. *Id*.

### 3. Investigators Forensically Examined the Cell Phones

Investigators reported to Faulkner and Wilson that they were having the phones forensically examined for the purposed of determining who was using the phones (thus identifying to whom they belonged). If Faulkner were able to discover the results of such forensic evaluations through discovery, he is confident it would be clear that no evidence links him to the phones.

5

### 4. Investigation Photographs and Documents Would Prove the Contraband Was Found In An Area Where Access By Prisoners Is Prohibited

A full disclosure of the investigative file (including photographs and other documents) would reveal that the contraband was found in a large commercial-type light fixture that would reasonably be off limits to inmates and was therefore not in a "common area."

Part of Faulkner's due process includes him having the right to call witnesses and present a defense. *See Wolff v. McDonnell,* 418 U.S. 539, 555–58 (1974). Faulkner should be allowed to conduct discovery and present his evidence at a hearing where he can compel witnesses to appear and testify. For these reasons, it is imperative to due process that Faulkner be allowed to conduct discovery and have a hearing wherein he can compel witnesses to testify in this case.

### C. The Magistrate's Recommendation Improperly Applies the "Some Evidence" Rule.

The reasoning used to arrive at the decision that "some evidence" was presented that Faulkner possessed the contraband in this case all revolves around Wilson being unable or unwilling to prove his statement that all the contraband belonged to him. Indeed, Respondent's brief states that "because the items were found in a common area of the cell, and Wilson could not prove all the phones belonged to [Wilson], all inmates will receive an incident report." *See* Doc. No. 11 at 2. This is a misguided interpretation of the "some evidence" requirement as applied in this case. Indeed, *all* of the evidence presented tends to prove that the contraband did *not* belong to Faulkner, nor was it in his "area" or under his control: It was not accessible from Faulkner's bunk, Faulkner stated it was not his, and Wilson stated that the contraband was all his and was under his control. BOP officials may not find Wilson credible, but there is no evidence at all to rebut his statements about the contraband being his.

The Magistrate's recommendation effectively conflates a "some evidence" standard on the one hand with a "within the realm of possibility" standard on the other. There is not one shred of

evidence on the record that Faulkner possessed or controlled the contraband. Of course, being generally assigned to the same room where the contraband was found brings Faulkner's culpability within the realm of possibility; but let us not mistake that for evidence. There is no evidence.

In an effort to produce "some evidence," Respondent points to the fact that Wilson changed his story and was unable to access some of the phones. *See* Doc No. 11 at 4. However, Wilson changing his story is no evidence that the contraband belonged to Faulkner, was under Faulkner's control, or was in Faulkner's area of responsibility. Wilson could have a thousand reasons to conceal the truth about the true owners of the contraband. It is common knowledge that ratting out fellow inmates in prison can be hazardous to an inmate's health. However, this does not amount to any evidence whatsoever of Faulkner's culpability.

While the bar set for the "some evidence" standard is low, it cannot be allowed to slip down to a "withing the realm of possibility" standard.

D. <u>Respondent's Use And Interpretation Of Program Statement 5270.09 Is Misapplied In This Case.</u>

Respondents rely on a Program Statement 5270.09, Inmate Discipline Program, to establish the standard for possession in this case; yet it is misapplied.

The DHO report quotes 5270.09 and describes the standard in the DHO report:

> Program Statement 5270.09, Inmate Discipline Program, states, "It is your responsibility not to waste food, to follow the laundry and shower schedule, maintain neat and clean-living quarters, to keep your area free of contraband, and to seek medical and dental care as you may need it." Your assigned cell is under your dominion and control. Therefore, the inmates assigned to the cell are all responsible to keep the area free of contraband.

*See* Doc. No. 11 at 3.

Program Statement 5270.09 (as quoted in the magistrate's recommendation) defines the area under an inmate's dominion and control as the "assigned cell." As noted above, Faulkner was

not assigned a cell.  Or, to the extent he was, there are approximately 120 other inmates assigned to the same cell. While 5270.09 does require inmates to keep their "area" free of contraband, this "area" is not well-defined in the context of the minimum-security complex where Faulkner was housed.  Indeed, it might be more useful in this case to define what is *not* an inmate's area. In this case, the "area" of any individual among the 120 inmates (except for Wilson) sharing one large cell would not reasonably extend to an area inside a light fixture that is 10 feet off the floor, off limits to inmates, and can only be accessed by standing on another inmate's bed.

Respondent also relies on *Flowers v. Anderson*, 661 F.3d 977 (8th Cir. 2011) to support this "common area" argument.  However, the *Flowers* court specifically distinguished cases where the contraband was found in an area that inmates are not authorized to access, such as above a ceiling.  *See Id.* at 985.  In this case, the contraband was found inside a light fixture, an area that inmates were not authorized to access. It was therefore *per se* not within the area controlled by Faulkner.  Faulkner could not have reasonably been expected to climb on top of another inmate's bed and access a light fixture for the purpose of ensuring there was no contraband there.

A read through of Respondent's brief leaves us with the belief that if Wilson had been able to access all the phones (thus proving that they were all his) no action would have been taken against Faulkner: "[I]t was determined that because the items were found in a common area of the cell, and Wilson could not prove all the phones belonged to him, all three inmates would receive an incident report for Code 108 – Possessing a Hazardous Tool."  *See* Document No. 7 at page 2.

This is not consistent with Respondent's position that the contraband simply being found in the same general area at Faulkner's bed was a violation of Code 108.  If that were the standard, there would be no need for an investigation into who owned or controlled the contraband; mere presence of contraband would be enough.  Respondent should choose what standard they are offering: whether there is "some evidence" (notwithstanding Wilson's statements) that Faulkner

owned or controlled the contraband, or whether there is some evidence that the contraband was simply present and that the simple presence of the contraband (even if nobody in the whole prison except McClelland knew about it) is sufficient to discipline Faulkner and everyone else who sleeps in the same large room.

Because nobody disputes that some items of contraband were found in a light fixture in a cell with 120 inmates, there would be no need to put on "some evidence" of that. Respondent is clearly offering that there is "some evidence" that Faulkner owned, possessed, or controlled the contraband; there is not.

For these reasons, the Magistrate's recommendations should be rejected; Petitioner Faulkner should be allowed to conduct appropriate discovery, and this matter should be set for an evidentiary hearing.

Respectfully submitted,

Koch Law Firm, P.A.
2024 Arkansas Valley Drive, Suite 707
Little Rock, Arkansas 72212
(501) 223-5310 office
(501) 223-5311 facsimile
reggie@reggiekoch.com

By: _____
Reggie Koch, Ark. Bar #2005125

# EXHIBIT A

**Wednesday, May 22, 2024 at 15:57:28 Central Daylight Time**

**Subject:** Re: Attorney Visit for Michael Blaine Faulkner, Reg No. 03829-078
**Date:** Tuesday, January 9, 2024 at 3:00:22 PM Central Standard Time
**From:** FOR-ExecAssistant-S (BOP)
**To:** reggie@reggiekoch.com

Good Afternoon,
Your request has been forwarded to the inmates Unit Manager for review.

**From:** reggie@reggiekoch.com <reggie@reggiekoch.com>
**Sent:** Tuesday, January 9, 2024 1:55 PM
**To:** FOR-ExecAssistant (BOP) <FOR-ExecAssistant@bop.gov>
**Subject:** [EXTERNAL] Attorney Visit for Michael Blaine Faulkner, Reg No. 03829-078

I need to set up an attorney visitation for the above-referenced inmate. I have tried to call numerous times and cannot get through, nor can I find an attorney visitation link on your website. Please advise how to proceed. Thank you.

Reggie Koch
Attorney

# EXHIBIT B

**Wednesday, May 22, 2024 at 15:57:53 Central Daylight Time**

---

**Subject:** Re: Attorney Visit for Michael Blaine Faulkner, Reg No. 03829-078
**Date:** Thursday, January 18, 2024 at 11:18:12 AM Central Standard Time
**From:** FOR-ExecAssistant-S (BOP)
**To:** reggie@reggiekoch.com

Good Morning,
I have forwarded your request to the Unit Manager. We ask for your patience due to the institution currently experiencing inclement weather.

---

**From:** reggie@reggiekoch.com <reggie@reggiekoch.com>
**Sent:** Thursday, January 18, 2024 9:09 AM
**To:** FOR-ExecAssistant-S (BOP) <FOR-ExecAssistant-S@bop.gov>
**Subject:** [EXTERNAL] Re: Attorney Visit for Michael Blaine Faulkner, Reg No. 03829-078

Good morning:

I am still unable to contact the Forrest City prison about visiting with my client.

---

**From:** FOR-ExecAssistant-S (BOP) <FOR-ExecAssistant-S@bop.gov>
**Date:** Tuesday, January 9, 2024 at 3:00 PM
**To:** reggie@reggiekoch.com <reggie@reggiekoch.com>
**Subject:** Re: Attorney Visit for Michael Blaine Faulkner, Reg No. 03829-078

Good Afternoon,
Your request has been forwarded to the inmates Unit Manager for review.

---

**From:** reggie@reggiekoch.com <reggie@reggiekoch.com>
**Sent:** Tuesday, January 9, 2024 1:55 PM
**To:** FOR-ExecAssistant (BOP) <FOR-ExecAssistant@bop.gov>
**Subject:** [EXTERNAL] Attorney Visit for Michael Blaine Faulkner, Reg No. 03829-078

I need to set up an attorney visitation for the above-referenced inmate. I have tried to call numerous times and cannot get through, nor can I find an attorney visitation link on your website. Please advise how to proceed. Thank you.

Reggie Koch
Attorney

# EXHIBIT C

Wednesday, May 22, 2024 at 15:55:43 Central Daylight Time

**Subject:** Re: [EXTERNAL] Connect
**Date:** Tuesday, March 26, 2024 at 12:24:02 PM Central Daylight Time
**From:** Young, Jessica (BOP)
**To:** reggie@reggiekoch.com

I am going to need to reschedule this call. Would you happen to be available Thursday 03/28 at 11AM CT?

*Jessica Young*

B-Upper Correctional Counselor
Crisis Support Team
F.C.C. Forrest City Medium
Ph. 870-494-4200 ext. 3372
Fax 870-494-4483
jmyoung@bop.gov

---

**From:** reggie@reggiekoch.com <reggie@reggiekoch.com>
**Sent:** Thursday, February 22, 2024 2:25 PM
**To:** Young, Jessica (BOP) <jmyoung@bop.gov>
**Subject:** Re: [EXTERNAL] Connect

Ms. Young:

Yes, I am available March 29th at 2:00 p.m.   The telephone number to call is 501-551-0301.

Also, I will complete this paperwork and return it to you soon.

Thanks so much for your help.

Reggie

---

**From:** Young, Jessica (BOP) <jmyoung@bop.gov>
**Date:** Thursday, February 22, 2024 at 1:28 PM
**To:** Reggie Koch <reggie@reggiekoch.com>
**Subject:** Re: [EXTERNAL] Connect

Please return attached form.  I have March 29th at 2 PM available for a phone call if that works for you. Please provide the number you would prefer us to call.

Thanks,

Jessica Young
B-Upper Correctional Counselor
Crisis Support Team
F.C.C. Forrest City Medium
Ph. 870-494-4200 ext. 3372
Fax 870-494-4483
jmyoung@bop.gov

---

**From:** Reggie Koch <reggie@reggiekoch.com>
**Sent:** Thursday, February 22, 2024 1:23 PM
**To:** Young, Jessica (BOP) <jmyoung@bop.gov>
**Subject:** [EXTERNAL] Connect


Sent from my iPhone

# EXHIBIT D

STATE OF OKLAHOMA   )
                    )ss.   **AFFIDAVIT**
COUNTY OF ROGERS    )

COMES NOW Sebastian Valence, who, after having been sworn to tell the truth, states and deposes as follows:

1. My name is Sebastian Valence. I live in Chelsea, Oklahoma. I am over the age of eighteen years and make the following statement based upon my personal knowledge.

2. My previous legal name was Wesley Ryan Wilson.

3. In September of 2022, I was incarcerated in a federal prison in Texarkana, Arkansas.

4. Inside the prison, the area where I slept was a large cell that housed approximately 120 inmates. The cell was partitioned into smaller rooms by sheetrock partitions, but there were no doors to these separate partitions. The whole cell, other than each inmate's private bed and locker, was a common area always accessible by all (approximately) 120 inmates.

5. Within that large cell, there were numerous large commercial-type light fixtures hanging from the ceilings, which were approximately 10 feet high. The areas inside and above these light fixtures—absent the use of a ladder or scaffolding of some sort—could only be accessed by a tall person standing on top of one of the top bunk beds. The areas inside and above the light fixtures were off limits to inmates, so they were not common areas.

6. In September 2022, guards at the Texarkana facility searched the area above my bunk bed, which was on top of another bed normally occupied by another inmate, Michael Blaine Faulkner. Inside the top of the light fixture that was located over my bed—and only accessible from my bed—the guards found contraband.

Escaneado con CamScanner

7. When the guards found the contraband in September 2022, I had only recently been assigned to that bed. The bed had previously been occupied by an inmate named Michael McClelland. McClelland worked in the electric shop and had constructed a shelf inside the top of the light and was managing and selling contraband that he stored there. McClelland had recently been caught selling contraband and had been removed from the unit; however, prison officials had not found his contraband stash in the light fixture.

8. I did find McClelland's leftover contraband electronics there and I began to manage that contraband myself. I also began storing my own cell phone there.

9. When asked about the contraband (after it was found by the guards) I truthfully stated that I possessed and controlled the contraband, but that some of it belonged to someone else. The actual owner of the contraband—except for my own cell phone—was Michael McClelland, but I refused to give McClelland's name at the time, because in prison it is dangerous to inform on other inmates.

10. During the investigation of this incident, the investigators told me that the cell phones were being forensically examined to determine who had been using the cell phones. However, I was never informed about the outcome of those forensic tests.

FURTHER AFFIANT SAYETH NOT.

*Sebastian Valence*

SUBSCRIBED AND SWORN to before me, a notary public, on this, the 24th day of May, 2024.

Notary Public

My Commission expires: 09-01-2025

2

Escaneado con CamScanner